Charles **STEWART** and Joan Stewart, Plaintiffs-Appellants,

v.

**CITY OF MARSHFIELD, Missouri,** a municipal corporation, Defendant-Respondent.

No. 8627.

Springfield Court of Appeals.

Missouri.

Sept. 3, 1968.

White & Dickey, Clyde R. Allemann, Springfield, for plaintiffs-appellants.

Roy C. Miller, Haymes & Haymes, Ellsworth Haymes, Marshfield, for defendant-respondent.

STONE, Judge.

In this "action for damages to land by reason of *permanent* nuisance" (as plaintiffs'-appellants' counsel characterize and classify it in the first sentence of their brief), plaintiffs Charles and Joan Stewart, husband and wife, obtained on June 23, 1966, a ten-member jury verdict for $2,500 upon which judgment then was entered. (All emphasis herein is ours.) In response to the timely after-trial motion of defendant City of Marshfield, Missouri, the trial court entered an order on August 29, 1966, sustaining that motion and granting a new trial to defendant on the specified ground that the court had erred in giving plaintiffs' measure of damages instruction 6 [MAI 4.01]. From that order, plaintiffs appeal.

Plaintiffs reside some three miles north of Marshfield on a 93-acre dairy farm "through the south portion" of which Niangua Creek runs "antigoggling . . . a little more than a quarter of a mile." Their residence is "less than a quarter of

a mile" from the creek. About one and one-half miles upstream from plaintiffs' farm, defendant has, since about August 15, 1961, operated two sewage lagoons into which it empties the load gathered in its municipal sewer system. The alleged nuisance, of which plaintiffs complain, is the claimed pollution of Niangua Creek by the outfall of and seepage from the sewage lagoons and the asserted invasion of plaintiffs' farm by noxious odors both from the sewage lagoons and from the polluted creek. In their third amended petition upon which they proceeded to trial, *plaintiffs* averred that the "nuisance is *permanent*"; their case was presented and submitted on that theory in the trial court; and, as we have observed, their presentation here is on the same theory. Although *defendant's* position in the trial court, as pleaded in its answer and supported by its evidence, was that, "if any nuisance has occurred, which defendant denies, such was *temporary* in nature," it does not, on this appeal, dispute the submissibility of the case on plaintiffs' theory that it is an "action for damages to land by reason of *permanent* nuisance." With submissibility of the case on that theory not in issue, a detailed evidentiary review would be superfluous and we briefly note only the testimony bearing upon the issue of damages.

Evidence was offered from which the triers of the facts could have found that Niangua Creek, as it flowed through plaintiffs' farm, had been so polluted that its waters had become unfit for piscatorial habitation or bovine use; that the milk production of plaintiffs' dairy herd had been reduced and, after two cows had aborted and others had sicknesses "suspected" by the attending veterinarian to have been caused by the polluted creek water, plaintiffs "shut the cattle off from the creek" and watered them from a well at the barn; and that, after a drastic decrease in milk production of the herd, plaintiffs finally disposed of their cows at public sale on September 19, 1964, taking "a loss on every cow." And there was evidence that "rot-ten" and "sickening" odors frequently had invaded plaintiffs' residence and had interfered with their use and enjoyment thereof.

In harmony with plaintiffs' theory of damages by reason of a *permanent* nuisance, their brief avers that *"the extent of plaintiffs' damages* was proved by the testimony of O. E. Blackwell, a real estate broker . . .," who supplied opinion evidence as to the diminution in the reasonable market value of plaintiffs' 93-acre farm by reason of such nuisance. According to witness Blackwell, that farm "was well worth $150 an acre" or $13,950 *before* defendant's sewage lagoons were constructed in 1961, but existence of the alleged nuisance (of which the witness disclaimed personal knowledge), "would cut the value of the place half." As of the time of trial, to wit, June 22, 1966, the reasonable market value of plaintiffs' farm, *if it had not been damaged by the alleged nuisance,* would have appreciated from $13,950 to $20,000; but existence of the nuisance "would cut the value in half . . . the same proportion," or to $10,000. Plaintiffs regard Blackwell's testimony as showing that the diminution in the reasonable market value of plaintiffs' farm by reason of the alleged nuisance would have been one-half of $13,950, or $6,975. Defendant "interprets" the same testimony as meaning that such diminution in reasonable market value would have been $3,950, the difference between its pre-nuisance undamaged value of $13,950 and its trial-date damaged value of $10,000. We pass this conflict of counsel with the comment that our acceptance of one viewpoint or the other is neither necessary to nor determinative of the appeal.

Plaintiffs offered, and the trial court gave, instruction 6 [MAI 4.01] on the measure of damages as follows: "If you find the issues in favor of the plaintiffs, then you must award the plaintiffs such sum as you believe will fairly and justly compensate the plaintiffs for any damages you may believe they sustained as a direct result of the occurrence mentioned in the evidence. M.A.I. 4.01." Defendant's con-

tention has been and is that "the instant case is one for damages for appropriation of property rights and the measure of damage instruction should have been the same as in an eminent domain or condemnation case," namely, MAI 9.02.

What was said by our Supreme Court, en banc, in the landmark case of Riggs v. City of Springfield, 344 Mo. 420, 430, 126 S.W.2d 1144, 1148, 122 A.L.R. 1496, an action by riparian landowners for damage akin to that for which instant plaintiffs sue, is instructive here: " 'The city, by proper proceedings to that end, had the right by statute to secure the use of this stream for sewer purposes.[1] The city did not condemn, but appropriated the use. Such action, however, does not deprive the plaintiff of his right to compensation; nor does it affect *the measure of damages, which, for such use by the city, whether by condemnation or appropriation, is the diminution in market value of the land damaged.*[2] As this court said, in McReynolds v. Railroad, 110 Mo. [484] loc. cit. 488, 19 S.W. 824, "no good reason, founded upon principle, can be assigned why the same rule should not be applied in both classes of cases" (condemnation and appropriation). The injury is the same; the damage is the same; and the compensation should be the same.' We hold, therefore, that under the pleadings and proof *this case is controlled and must be determined by the law of eminent domain.*" And in Stewart v. City of Springfield, 350 Mo. 234, 248, 165 S.W.2d 626, 630(9), the court, en banc, declared that "[w]e find it a common rule that 'the discharge of sewage upon the property of an individual, or its discharge into a stream, so as to pollute the water and lessen or destroy the value of the stream itself, or of private property

situated thereon, is *generally considered compensable under eminent domain provisions,*' 29 C.J.S. Eminent Domain § 118."

In Newman v. City of El Dorado Springs, Mo.App., 292 S.W.2d 314, and again in Hillhouse v. City of Aurora, Mo. App., 316 S.W.2d 883, we developed the doctrine that, having appropriate regard for scientific advances, it no longer should be said that a municipal sewer system (or a part thereof) inherently, necessarily and inevitably creates or constitutes a *permanent* nuisance. And our Supreme Court has so recognized in subsequent opinions citing Newman and Hillhouse with approval and affirming judgments for *temporary* or *abatable* nuisances arising out of the operation of municipal sewer systems. Flanigan v. City of Springfield, Mo., 360 S.W.2d 700; Chappell v. City of Springfield, Mo., 388 S.W.2d 886. However, no case has been cited or found which in any wise questions the doctrine that an action, such as that at bar, for damages to land by reason of a *permanent* nuisance *"is controlled and must be determined by the law of eminent domain."* Riggs, supra, 344 Mo. at 430, 126 S.W.2d at 1148. Rather, in continued recognition and application of that guiding principle, it was stated in Lewis v. City of Potosi, Mo.App., 317 S.W.2d 623, 629(4, 5), a suit for damage to land by operation of a sewage disposal plant, that "[a]n action by a landowner against a municipality for the maintenance of a *permanent* nuisance of the character here involved, which adversely affects the value of the plaintiff's land, *is by the demand for permanent damage converted into an action in the nature of a condemnation proceeding. The pollution of the stream is equivalent to a taking or an appropriation of the plaintiff's property in*

---

1. Instant defendant, a city of the fourth class, had the same right to secure the use of Niangua Creek. V.A.M.S. §§ 250.010 (1), 88.844, 88.077; City of Ash Grove v. Davis, Mo.App., 418 S.W.2d 194, 205.

2. Newman v. City of El Dorado Springs, Mo.App., 292 S.W.2d 314, 317; Newkirk

v. City of Tipton, 234 Mo.App. 920, 931, 136 S.W.2d 147, 152(8). The same measure of damages is otherwise stated as "the difference in the market value of the land before and after." Newman, supra, 292 S.W.2d at 318; Lewis v. City of Potosi, Mo.App., 317 S.W.2d 623, 629.

*part, and the law permits the acquisition of the easement in such cases by the payment of permanent damages, the judgment having that effect."* MAI 9.02 is the approved measure of damages instruction where only "part of property [is] taken." That is the situation in the case at bar, where defendant is alleged to have taken only property rights, i. e., the right to use Niangua Creek for sewer purposes and the right to invade plaintiffs' land with foul and noxious odors arising from such use of the creek and from operation of defendant's two sewage lagoons.

The Committee on Jury Instructions requested "that the Supreme Court adopt the recommended rules requiring that when an approved instruction is *applicable* it must be given to the exclusion of any other instruction on the same subject." MAI p. xxi. That request was honored [V.A.M.R. Rule 70.01(b)] and repeatedly thereafter our appellate courts have reminded the bench and bar that this is "[t]he basic theory concerning the use of MAI . . . ."[3] So it is that, in introductory directions on "How To Use This Book" [MAI p. xxxi], the first admonition of the Supreme Court is "SELECT THE APPROPRIATE INSTRUCTION" and, under that heading, it is pointed out that "[t]he lawyer must know enough about his case to choose the appropriate instruction. . . . The instructions are approved for use in cases where applicable and lawyers and trial judges must make this determination. . ." And as a prespicacious appellate jurist, particularly interested in this subject, recently warned: "Cases show that drafting a set of instructions requires more than merely picking MAIs out of the book. Other parts of the book are just as vital. High on the recommended reading list and mighty in content is 'How To Use This

Book,' at MAI pages xxxi to xxxv. What the Supreme Court says there is as much a part of MAI as the instruction forms themselves. It warns counsel that the instruction selected must be appropriate, and to make that decision he must know the substantive law of his case." Clemens, Use and Abuse of MAI, 24 J.Mo.Bar 236, 237 (June 1968).

Relying upon Jack L. Baker Cos. v. Pasley Mfg. & Distributing Co., Mo., 413 S.W.2d 268, a suit for damage to structures and for alleged resulting loss of business profits, instant plaintiffs assert that MAI 4.01 "was the proper [measure of damages] instruction to be given." But Baker was not a case "controlled and [to] be determined by the law of eminent domain" [Riggs, supra, 344 Mo. at 430, 126 S.W.2d at 1148] as is the action at bar, and the court specifically noted in Baker [413 S. W.2d at 273] that *"[o]nly in the case of eminent domain cases did the court retain language with respect to fair market value before and after in determining the amount of damages. See MAI 9.02."* Furthermore, having held in Baker that plaintiff did not make a submissible case as to alleged loss of business profits [413 S.W.2d at 272], the court observed on the issue of damage to structures [413 S.W.2d at 273] that evidence of the cost of repairs had been received, that "[e]vidently the jury concluded that the sum [awarded] represented plaintiff's actual property damage," and that the "[c]ases in this state do recognize that where damaged property can be restored to 'its former condition at a cost less than the diminution in value, the cost of restoration is the proper recovery. Curtis v. Fruin-Colnon Contracting Co., 363 Mo. 676, [686], 253 S.W.2d 158, [164 (12)]." See also Kirst v. Clarkson Const. Co., Mo.App., 395 S.W.2d 487, 492(9);

3. Peak v. W. T. Grant Co., Mo. (banc), 409 S.W.2d 58, 60; Sweatman v. McClure, Mo.App., 416 S.W.2d 665, 667; Howe v. Bowman, Mo.App., 429 S.W.2d 339, 341. See Tietjens v. General Motors Corp., Mo., 418 S.W.2d 75, 88; Jack L. Baker Cos. v. Pasley Mfg. & Distributing Co., Mo., 413

S.W.2d 268, 273; Moore v. Quality Dairy Co., Mo.App., 425 S.W.2d 261, 266(9); Martin v. Yeoham, Mo.App., 419 S.W.2d 937, 947; Hawkeye-Security Ins. Co. v. Thomas Grain Fumigant Co., Mo.App., 407 S.W.2d 622, 628(5).

Beaty v. N. W. Electric Power Coop., Mo.App., 296 S.W.2d 921, 925(5, 6).

In Baker, evidence as to the value of plaintiff's property immediately before and after the explosion also was received; and, with respect to that evidence, the opinion records the significant fact "that plaintiff was permitted to argue that testimony to the jury" and in note 2 points out: "This is what the directions contemplate. The Committee's Comment under MAI 4.01 includes the following: 'During the instruction conference the parties and the Court should discuss *(on the record)* just what damages are supported by the evidence and can properly be argued to the jury. In this way jury arguments can proceed without undue interruptions.'" 413 S.W.2d at 273. In the instant case, the transcript reflects nothing concerning the instruction conference save only the general objections of opposing counsel to the instructions given for the adversary party or parties (every offered instruction was given—see MAI p. xxxv) and, with none of the arguments included, affords no clue as to what counsel told the jury.

■ The substantive law of the case at bar directs us to MAI 9.02 as the appropriate measure of damages instruction; and that instruction, with suitable adaptation, should have been given. Hence, the giving of plaintiffs' instruction 6 (MAI 4.01) constituted error, "its prejudicial effect to be judicially determined." V.A.M.R. Rule 70.01(c). As to this, plaintiffs' counsel argue that the giving of instruction 6, if improper, could not have been prejudicial "in that the award of damages was well within the evidence." To this point, they cite several *pre-MAI* decisions [4] and V.A. M.R. Rule 83.13(b). Under circumstances in no wise analogous to those here presented, the cited cases did recognize and apply the general principle that, where the damages awarded are not excessive and fairly

represent the damages shown by the evidence, an erroneous or inaccurate measure of damages instruction does not necessarily constitute reversible error; and, in the determination of this case, we do not repudiate that principle, although it may be timely to point out "that the key word in that rule is 'necessarily.'" Waymire v. Carter, Mo.App., 366 S.W.2d 74, 80. It is true that, as plaintiffs emphasize, the only opinion evidence concerning the difference in the reasonable market value of plaintiffs' farm before and after was that offered by witness Blackwell, whose testimony has been, as we have noted, diversely construed by opposing counsel as having placed that difference at $6,975 or $3,950. But in this connection, other matters also should be considered.

All interested counsel accept the undoubted truth that "the damages [recoverable herein] are confined to the diminished value of the land incident to the maintenance of the permanent nuisance, which is in the nature of an easement." Lewis, supra, 317 S.W.2d at 629(6). However, plaintiffs' instruction 6 (MAI 4.01) conferred carte blanche authority for plaintiffs' counsel to have sought in their arguments (with no limitations revealed by the transcript on appeal, our only source of information), and for the jury to have included in their award, damages for various items such as the sicknesses and abortions of plaintiffs' cows, the drastic decrease in milk production of their herd, their loss upon disposition of the herd at public sale, additional veterinary expenses, the destruction or dispersal of fish from Niangua Creek, etc. Of course, evidence pertaining to such items was relevant upon the issues as to the existence and character of the alleged nuisance and as to the alleged diminished market value of plaintiffs' farm by reason thereof, but damages for those items as such were not recoverable. Lewis,

4. Blydenburgh v. Amelung, Mo.App., 309 S.W.2d 150, 153–154(7, 8); LaPlant v. E. I. DuPont De Nemours & Co., Mo. App., 346 S.W.2d 231, 243–244(22, 23); McCreary v. Employers Mutual Fire Ins. Co., Mo.App., 378 S.W.2d 243, 248–249 (6–8); Black v. Highley, Mo.App., 382 S.W.2d 46, 49(3–5).

supra, 317 S.W.2d at 629(7, 8). However, nothing in the record indicates that the jury ever was advised either by the court or by counsel as to the correct measure of damages.

In pondering plaintiffs' plea of nonprejudice, we also have in mind the state of the record on the fundamental and sharply-contested issue as to whether plaintiffs' farm had been damaged by a *permanent* nuisance. In a colloquy between court and counsel, plaintiffs' attorney said "it is up to the jury to say whether it is permanent or not; it is a jury question." Yet, the issue of permanence vel non of the nuisance allegedly resulting from the sewage lagoons constructed in 1961 was in no manner submitted to, or even called to the attention of, the jury in plaintiffs' sole verdict-directing instruction 5 or, for that matter, in any instruction. Hence, with the arguments of counsel unreported, whether the jury was advised of this basic issue is not here known or ascertainable.

"All deviations from the straight and narrow path prescribed in MAI will be presumed prejudicially erroneous unless it is made perfectly clear that no prejudice has resulted. The requirements of MAI are mandatory. The burden of establishing nonprejudice is on the proponent of the instruction. That it is the policy of this court to require strict compliance with all of the requirements of MAI is made clear in Brown v. St. Louis Public Service Co., Mo., 421 S.W.2d 255 . . . ." Murphy v. Land, Mo., 420 S.W.2d 505, 507(4–7); Moore v. Huff, Mo.App., 429 S.W.2d 1, 3–4. See Scheele v. American Bakeries Co., Mo., 427 S.W.2d 361, 364.

■ Hence, "where there is *deviation* from an applicable MAI instruction which does not need modification under the facts in the particular case, prejudicial error will be presumed unless it is made perfectly clear by the proponent of the instruction that no prejudice *could* have resulted from such deviation,"[5] A fortiori, the same must be true where, as here, an inapplicable instruction [MAI 4.01] has been given instead of an applicable one [MAI 9.02]. Epps v. Ragsdale, Mo.App., 429 S.W.2d 798, 801(6). See Sweatman v. McClure, Mo.App., 416 S.W.2d 665, 667(2); Martin v. Yeoham, Mo.App., 419 S.W.2d 937, 946–947(6).

■ Finally, we recall the "familiar, well established principle that this Court will be more liberal in upholding the trial court's action in sustaining a motion for new trial than in denying it. . . . . 'This is because the power of the trial court to grant a new trial is an exercise of its judicial discretion, which may be based upon matters known to the court (often said to be in the breast of the court) because the trial judge participated in the trial and knew what took place.' Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297, 300." Johnson v. West, Mo., 416 S.W.2d 162, 166(5); Robben v. Peters, Mo. App., 427 S.W.2d 753, 758. See Pollard v. General Elevator Engineering Co., Mo., 416 S.W.2d 90, 96(6); Brown v. St. Louis Public Service Co., Mo. (banc), 421 S.W.2d 255, 260 (concurring opinion).

■ Being satisfied that instant plaintiffs have not made it perfectly clear that no prejudice could have resulted from the giving of their instruction 6 [MAI 4.01], we are constrained to conclude that the order granting a new trial to defendant must be affirmed. So determining, it becomes unnecessary to discuss and rule defendant's

5. Brown v. St. Louis Public Service Co., Mo. (banc), 421 S.W.2d 255, 259(3); Cash v. Bolle, Mo. (banc), 423 S.W.2d 743, 745; Gousetis v. Bange, Mo., 425 S.W. 2d 91, 95(5); Brannaker v. Transamerican Freight Lines, Inc., Mo., 428 S.W.2d 524, 537; Slyman v. Grantello, Mo.App., 429 S.W.2d 282, 283; Moore v. Huff, Mo. App., 429 S.W.2d 1, 5; Robben v. Peters, Mo.App., 427 S.W.2d 753, 756. See Chappell v. City of Springfield, Mo., 423 S.W. 2d 810, 812; Hunter v. Norton, Mo., 412 S.W.2d 163, 166(8, 9); Motsinger v. Queen City Casket Co., Mo., 408 S.W.2d 857, 860; Leathem v. Longenecker, Mo., 405 S.W.2d 873, 877.

further point that prejudicial error also was committed in the giving of plaintiffs' verdict-directing instruction 5, "not in M.A.I." However, in the interest of minimizing the possibility of error upon retrial, we observe that MAI 26.05 is the verdict-directing instruction in eminent domain cases where property rights such as easements are taken, and we suggest that plaintiffs' counsel would be well-advised to submit their cause of action predicated on an alleged *permanent* nuisance by an instruction adapted from MAI 26.05.

The order granting a new trial to defendant is affirmed and the cause is remanded.

HOGAN, P. J., and TITUS, J., concur.